REYNA, Circuit Judge,
concurring.
The Constitution bestows on Congress the power to secure inventors’ “exclusive Right[s]” to their inventions. U.S. Const. Art. I, § 8. The utility of this power would, according to James Madison, “scarcely be questioned” as the rights to inventions “belong to the inventors.” The Federalist No. 43, p. 214 (L. Goldman ed. 2008) (J. Madison). In the years since Congress first exercised this power and enacted the first Patent Act in 1790, courts have varied in how they have protected the right to exclude, first preferring damages, then granting injunctions routinely, and recently rigorously applying the irreparable injury factor of the four-part eBay test. The court today correctly concludes that Apple, Inc. is entitled to a narrow, feature-based injunction against Samsung[1] because Samsung’s infringement will likely cause Apple to lose downstream sales. I agree with this decision and note that it leaves open the door for obtaining an injunction in a case involving infringement of a multi-pat-ented device, a door that appears near shut under current law.
I write to add that I believe Apple satisfied the irreparable injury factor based on Samsung’s infringement on Apple’s right to exclude and based on the injury that the infringement causes Apple’s reputation as an innovator. There is no dispute that Samsung has infringed Apple’s right to exclude and, absent an injunction, it will likely continue to do so. I believe that such a finding satisfies the irreparable harm requirement because the infringement is, in this case, “irreparable.” On reputational injury, the roles are reversed: it is undisputed that such an injury is irreparable; the question is whether this injury will likely occur. As I explain below, I believe that the record here — particularly the toe-to-toe competition between Apple and Samsung, Apple’s reputation as an innovator, and the importance of the patents-in-suit to that reputation — establishes that Apple will likely suffer irreparable harm to its reputation.
I. Injury to The Right to Exclude is an “Injury” That is, in this Case, “Irreparable.”
A patentee’s rights spring forth from the Constitution, which gives Congress the power to “secur[e] for limited Times to ... Inventors the exclusive Right to their respective ... Discoveries.” U.S. Const. Art. I, § 8. Under this grant of authority, Congress has given patentees “monopoly rights.” F.T.C. v. Actavis, Inc., — U.S. -, 133 S.Ct. 2223, 2240, 186 L.Ed.2d 343 (2013) (Roberts, C.J., dissenting). That is, the patentee obtains the right to invoke the “State’s power” to prevent others from engaging in certain activities. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Those activities include “making, using, offering for sale, or selling the *1367 invention throughout the United States or importing the invention into the United States,” and if the invention is a process, “using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process.” 35 U.S.C. § 154(a)(1).
These monopoly rights do not necessarily entitle a patentee to injunctive relief. At least as far back as the 17th century, courts have required a showing of “irreparable” injury before granting injunctive relief. See Laycock, Douglas, Death of the Irreparable Injury Rule, 103 Harv. L.Rev. 687, 699 (1990) (“Laycock”). After Congress passed the first Patent Act in 1790 up until 1819, American courts generally found that the patent statutes provided damages as the remedy for patent infringement, meaning that infringement of patent rights did not constitute an irreparable injury. See Root v. Lake Shore & M.S. Ry. Co., 105 U.S. 189, 192, 26 L.Ed. 975 (1881); Frankfurter, Felix, The Business of the Supreme Court of the United States — A Study in the Federal Judicial System, 39 Harv. L.Rev. 587, 616-17 (1926). In 1819, Congress specifically granted courts the authority to grant injunctions in cases involving patent infringement. Root, 105 U.S. at 192. From this point until the 20th century, courts granted injunctions in patent cases where the defendant was shown to be likely to continue to infringe. Robinson, William C., The Law of Patents for Useful Inventions, § 1088 (1890); Lipscomb, Ernest Bainbridge, III, Walker on Patents, § 25:33 (1988). In the early 20th century, courts went further, holding that the default rule was that monetary damages were insufficient to compensate for infringement on the right to exclude. E.g., Am. Code Co. v. Bensinger, 282 F. 829, 834 (2d Cir.1922) (“In cases of infringement of copyright, an injunction has always been recognized as a proper remedy, because of the inadequacy of the legal remedy.”) Our court followed suit, holding that where “validity and continuing infringement have been clearly established,” irreparable injury is .presumed. Smith Intern., Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed.Cir.1983). We eventually created a default rule that an injunction would issue when infringement has been established, absent a “sound” reason for denying it. Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246-47 (Fed.Cir.1989), cert. denied, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).
In eBay Inc. v. MercExchange, L.L.C., the Supreme Court rejected that default rule, holding that a plaintiff seeking a permanent injunction must satisfy the four-factor test historically employed by courts of equity, including establishing irreparable injury. 547 U.S. 388, 391, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Though we read eBay to overrule our presumption of irreparable injury, we cautioned that courts should not necessarily “ignore the fundamental nature of patents as property rights granting the owner the right to exclude.” Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed.Cir.2011). Yet our recent cases have done precisely that, ignoring the right to exclude in determining whether to issue an injunction. Indeed, our opinions in the most recent cases between Apple and Samsung do not even mention the right to exclude as a possible basis for injunctive relief.[2]
I believe that this recent trend extends eBay too far. Infringement on the right to exclude is, in my view, an “injury” that *1368 is sometimes irreparable. An “injury” is not limited to tangible violations but rather encompasses “violation[s] of another’s legal right, for which the law provides a remedy; a wrong or injustice.” Injury, Black’s Law Dictionary (10th ed.2014) (emphasis added). Courts have routinely granted injunctions when constitutional rights are at issue. 11A Charles Alan Wright et al. Federal Practice & Procedure § 3942 (3d ed.). Nor is this approach limited to rights derived from the Constitution — courts have granted injunctions against private parties based on various statutorily-granted rights. See, e.g., E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div., 821 F.2d 1085, 1090 (5th Cir.1987) (employment discrimination); Park Vill. Apartment Tenants Ass’n v. Mortimer Howard Trust, 636 F.3d 1150, 1152 (9th Cir.2011) (statutory housing rights); Armstrong v. Schwarzenegger, 622 F.3d 1058 (9th Cir.2010) (ADA rights).
There is no reason to treat patent rights differently. As the majority aptly puts it, the right to exclude is “important.” Maj. Op. at 1360. The patentee earned this right by disclosing a useful invention to the public. See 35 U.S.C. §§ 101, 112. Madison recognized the balance between the right to exclude and the benefit extended to society by the disclosure included in a patent as a “public good.” The Federalist No. 43, p. 214 (L. Goldman ed. 2008) (J. Madison). When courts do not force the public to hold up its end of the bargain they inhibit rather than “promote” the “progress of the useful arts.” U.S. Const. Art. I, § 8. Indeed, Chief Justice Roberts’s concurrence in eBay, discussed in more detail below, implicitly acknowledges that infringement on the right to exclude is an injury for which an injunction can be granted. eBay, 547 U.S. at 395, 126 S.Ct. 1837.
Such an injury can be irreparable. In' this context, “irreparable” does not mean that the injury cannot be remedied at all. If that were the case, the plaintiff would not have standing to sue. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). What makes an injury “irreparable” is that legal damages, i.e., monetary relief, cannot remedy the harm. See Laycock at 694. Courts have provided several reasons why this may be the case, including instances in which injury is repeated or threatened, substitutes are difficult to obtain, or damages are difficult to measure. See, e.g., Mark P. Gergen et al., The Supreme Court’s Accidental Revolution? The Test for Permanent Injunctions, 112 Colum. L.Rev. 203, 237 (2012) (“Gergen”).
The last of these concerns was the reason courts traditionally found infringement of intellectual property rights to be irreparable. As Chief Justice Roberts explained in his eBay concurrence:
From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This “long tradition of equity practice” is not surprising, given the difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee’s wishes — a difficulty that often implicates the first two factors of the traditional four-factor test.
eBay, 547 U.S. at 395, 126 S.Ct. 1837. As Justice Kennedy explained, however, this traditional model does not always apply, particularly when the patentee is a nonpracticing entity:
An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a *1369 bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent. When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest.
Id. at 396-97, 126 S.Ct. 1837. Where the patentee is an entity that uses patents primarily to obtain licensing fees, its business objectives are premised on monetary relief being sufficient to compensate for infringement. The relationship between the patentee and the infringer is also relatively simple, making damages relatively straightforward to calculate.
That is not the case here. Apple’s business objectives encompass far more than obtaining licensing fees. And the relationship between Apple and Samsung is complex. Apple and Samsung “fiercely” compete in the mobile device hardware and software markets. The device hardware market includes multiple competitors, but Apple and Samsung stand alone as the market leaders. They also compete in the device operating system market, where Apple’s “iOS” operating system competes with Google, Ine.’s “Android” operating system.
Apple effectively created the smart-phone market when it launched its iPhone in June 2007. According to Phil Schiller, the head of Apple’s Worldwide Marketing Group, Apple sold 300,000 units during its first quarter. J.A. 10447. This figure rose to over 10 million at the start of 2009. Id. According to Mr. Schiller, what distinguished Apple’s phones was that they were controlled completely by software (as opposed to buttons on the phone), which allowed users to access media and the Internet. J.A. 10449. Apple released its tablet, the iPad, in 2010, and it too enjoyed great success. J.A. 10451: When Samsung entered the smartphone market, releasing its own line of “Galaxy” smart-phones, Apple took notice. To Mr. Schiller, Samsung’s smartphones seemed like an “attempt to copy the iPhone.” J.A. 10470. By August of 2011, when Apple was releasing version 5 of iOS, the relationship between Apple and Samsung, in Mr. Schiller’s words, “wasn’t a good relationship.” J.A. 10473. Apple and Samsung had created an “extremely competitive environment.” J.A. 10473. Apple and Samsung were at the time of trial, according to Mr. Schiller, “head-to-head” competitors in a variety of retail markets for smartphones and tablets. J.A. 10469.
From Samsung’s perspective, the competition was equally vigorous. In its internal marketing documents, Samsung listed one of its 2010 objectives in market reputation terms to “overcome fast follower status and establish Samsung as a challenger to Apple.” J.A. 11703. In Samsung’s view, the marketplace mainly involved competition between devices that run Apple’s iOS and devices that run Google’s Android. J.A. 11708. Indeed, Samsung’s counsel asserted in its opening statement that “Apple has sued ... the biggest user of Google’s Android software and the most successful manufacturer of Android phones, Samsung, to try to prevent it from selling phones with that leading Android software....” J.A. 10361. Samsung, however, also attempted to distinguish its devices from Apple’s through hardware advancements, including, for example, larger screen sizes, near field communications, and allowing for the use of a stylus. J.A. 11710. Despite this fierce, toe-to-toe competition, Apple and Samsung are also business partners. Samsung supplies about 25 percent of the components in the iPhone. J.A. 11712.
*1370 This evidence demonstrates that the relationship between Apple and Samsung is dramatically different from a non-practicing entity and an infringer. Apple’s business objective is not merely to obtain licensing fees from Samsung. Rather, it seeks to firmly establish and grow its market share in the rapidly evolving smart-phone and tablet market. In a marketplace this complex, it is difficult, if not impossible, for a court to accurately value Apple’s right to exclude. How, for example, does Apple value its rights to exclude relative to other means for competing against Samsung? What effect does the infringement have on how consumers view subsequently released products? How would Apple’s existing business relationship with Samsung factor into this valuation? Courts are not equipped to answer these questions.
In sum, a jury found that Samsung infringed Apple’s right to exclude. Apple has been injured and, absent an injunction; that injury will likely continue. eBay and its progeny explain that such a finding is not necessarily sufficient to meet the irreparable harm requirement. But that does not mean we 'should ignore this injury. In view of Apple’s and Samsung’s unique competition, I would conclude a court cannot accurately determine the extent of Apple’s injury, and thus, I would find that Samsung’s infringement of Apple’s patent rights irreparably injures Apple.
II. Apple has shown that Samsung’s Infringement will Likely Injure Apple’s Reputation as an Innovator.
Having determined that Apple established irreparable injury via lost downstream sales, the majority opinion does not reach the issue of reputational injury. Maj. Op. at 1365, n. 2. I would reach this issue and hold, in the alternative, that Samsung’s continued infringement would irreparably injure Apple’s reputation as an innovator.
To establish any irreparable injury, this court has generally required the plaintiff to establish a “causal nexus”: “[t]o show irreparable harm, it is necessary to show that the infringement caused, harm in the first place.” Apple I, 678 F.3d at 1324 (emphasis added). The problem with this formulation is that it necessarily focuses on the past, and in doing so effectively requires the plaintiff to show a near certainty of irreparable harm and not a “likelihood” of harm. As the Supreme Court explained more than sixty years ago, in-junctive relief addresses future harms and the past is only relevant as an indicator of the future:
The sole function of an action for injunction is to forestall future .violations.... All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur.... In a forward-looking action such as this, an examination of ‘a great amount of archeology’ is justified only when it illuminates or explains the present and predicts the shape of things to come.
United States v. Or State Med. Soc., 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) (Jackson, J.). In Winter v. Natural Resources Defense Council, Inc., the Court further explained that a plaintiff must show that irreparable injury is “likely” in the absence of an injunction. 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).[3] While “likely” is more demanding than *1371 “possible,” it does not require a showing that the injury is certain or nearly certain. Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1191 (9th Cir.2011). Rather, the plaintiff must show that irreparable injury is more likely than not to occur absent an injunction. Cf. Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1166 (Fed.Cir.2014) (explaining that “likely” success on the merits means “more likely than not”).
A plaintiff can meet this burden by showing that it will likely suffer an injury and, separately, satisfy the nexus requirement by showing that this injury is causally linked to the infringement. The plaintiffs evidence often comes in the form of empirical data showing both a past injury and a causal link between that injury and the past infringement.[4] The district court faults Apple for not following this' methodology here, finding significant that Apple’s data do not empirically show that its reputation had been harmed. Apple Inc. v. Samsung Elecs. Co., Ltd., No. 12-CV00630, 2014 WL 7496140, at *15-17 (N.D.Cal. Aug. 27, 2014). But our case law does not require a plaintiff to follow this methodology. A plaintiff can instead rely on a theory of causation to show that it will be irreparably harmed. In other words, the plaintiff can show both the presence of irreparable injury and the causal nexus by establishing circumstances under which infringement would more likely than not cause the claimed injury. This was how the patentee proved irreparable injury in Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336 (Fed.Cir.2013).
In that case, the patentee, Douglas Dynamics, and infringer, Buyer Products, were competitors in the market for snowplow assemblies often mounted on the front of a truck. Id. at 1339. Douglas Dynamics had about sixty percent of the market share and was recognized as being an innovator. Id. The patented features were recognizable by consumers, thus influencing how consumers viewed Douglas Dynamics. The patented features included a mounting frame that did not extend beyond the vehicle’s bumper, reducing the likelihood of inadvertent damage and allowing drivers to “remove heavy portions of the snowplow assembly from the vehicle when the plow is not in use, thus reducing stress on the vehicle’s suspension.” Id.
We held that the district court abused its discretion in finding that Douglas did not meet the irreparable injury factor. Id. In particular, we held — without any empirical evidence of injury or causal nexus— that the district court’s finding that Douglas Dynamics’s reputation would not be injured by the infringement was clearly erroneous. Id. at 1344. Infringement, we explained, can harm a company’s reputation, “particularly its perception in the marketplace by customers, dealers, and distributors.” Id. Douglas Dynamics’s reputation would “certainly be damaged” if customers found the patented features appearing in a competitor’s product. Id. at 1344-45. Douglas Dynamics would be perceived as less of an innovator because its competitors could incorporate the patented features without noting that they belonged to Douglas Dynamics. Id. at 1344. Exclusivity, we further explained, is “an intangible asset that is part of a company’s reputation.” Id. at 1345. “Where two companies are in competition against one another, the patentee suffers the harm — often irreparable — of being forced to compete against products that incorporate and infringe its own patented inventions.” Id. Where the patentee and the infringer are toe-to-toe competitors in a *1372 two-competitor marketplace, the loss of reputation caused by infringement marks a gain of reputation of the infringer as an innovator.
On the record before us, I would hold that Apple has shown that it will likely suffer irreparable injury. First, Apple and Samsung are direct competitors in the smartphone and tablet market. We have repeatedly held after eBay that competition between the patentee and the infringer, particularly direct competition, strongly militates toward a finding of'irreparable harm. As noted above, in Douglas Dynamics, we focused on the competition between the patentee and the infringer. Id. In Presidio Components, we explained that direct competition is “one factor suggesting strongly the potential for irreparable harm.” Presidio Components Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed.Cir.2012) (internal citation omitted). And in Trebro Manufacturing, we explained that because the record showed that the patentee and the infringer were direct competitors, it “strongly show[ed] a probability for irreparable harm.” Trebro Mfg. v. Firefly Equipment, 748 F.3d 1159, 1171 (Fed.Cir.2014). This factor is especially strong here because Apple and Samsung are toe-to-toe competitors in a unique marketplace.
Second, like Douglas Dynamics, Apple’s reputation as an innovator is critical to its ability to compete against Samsung. As the district court explained, Apple has a strong reputation as being an innovator, in the smartphone and tablet market. See 2014 WL 7496140 at *15. Samsung appears to concede this point, going so far as to refer to Apple as an “amazing innovative company” in its opening statement at trial. J.A. 10361. Mr. Schiller testified that Apple prizes this reputation, explaining that the “very DNA” of Apple is that it is an innovator that “creates unique differentiations in [its] products that customers value.’7 J.A. 10453. He further explained that Apple’s marketing strategy was “The Product as Hero.” J.A. 10466. That is, the features of the product are the emphasis of the marketing, not, e.g., price, customer service, etc. See id.
The patents at issue here cover the types of features that made Apple’s products the “hero.” These patents cover features that consumers regularly interact with, thereby influencing how consumers perceive Apple, not latent features which consumers may not be aware of. Douglas Dynamics, 717 F.3d at 1339. For example, U.S. Patent No. 5,946,647 discloses software that allows a user to take action with respect to a detected phone number by dialing a phone number without exiting one program and entering another. '647 patent col. 5 11. 38-50. These features were so important that Apple included it across all of its products, including iPhones and iPads. J.A. 10794. U.S. Patent No. 8,046,721 discloses a device that a user unlocks with gestures. '721 patent col. 8 11. 49-55. This feature was one of the features that Apple marketed in its first ads. It represented a “great beginning” that customers often utilize. J.A. 10433-34, 21014, 10602-04. Similarly, U.S. Patent No. 8,074,172 discloses a method for automatically correcting spelling errors as a user types words using a touchscreen device, a boon for those who would accept a misspelled word in favor of looking up its correct spelling. '172 patent col. 9 11. 11-27.
In Douglas Dynamics, we explained that when customers find the patentee’s innovations appearing in a competitor’s products, the patentee’s reputation as an innovator will “certainly” be damaged. Douglas Dynamics, 717 F.3d at 1344-45. That reasoning applies with great force here. Though the parties dispute whether Apple practices every aspect of the *1373 claimed inventions, it is essentially undisputed that Apple’s products include similar features that compete with the patented features, as practiced in Samsung’s products. The presence of the patented features in the products of Apple’s chief competitor communicates a message that Apple’s corresponding features are commonplace, not innovative. Samsung’s infringement thus neutralizes the beneficial impact that Apple’s corresponding features have in the mind of the consumer. This injury is amplified here because of the toe-to-toe competition between Apple and Samsung. In such a market, even otherwise minor differences between competitors are magnified ás each competitor attempts to gain some advantage over the other, such as the perception that one is a greater .innovator than the other.
Apple’s reputational injury is all the more important here because of the nature' of Apple’s reputation, i.e., one of an innovator (as opposed to, e.g., a producer of low-cost goods). Consumers in the smart-phone and tablet market seek out innovative features and are willing to pay a premium for them. Sometimes consumers in this market will even prioritize innovation over utility. A reputation as an innovator creates excitement for product launches and engenders brand loyalty. Samsung recognized the importance of such a reputation and set its sights not on developing more useful products, but rather to overcome the perception that it was a “fast follower.” Apple, 2014 WL 7496140, at *8.
Samsung argues that some or all of the patented features not being exclusive to Apple “defeats any claim of reputational harm.” Appellee Br. -38. Apple appears to concede that it has license agreements with Nokia and HTC.[5] Appellant Br. 46. Apple also appears to have license agreements with Microsoft and IBM', but Samsung did not rely 'on these licenses before the district court.- 2014 WL 7496140 at *33, n. 7. A patentee’s willingness to license can militate against a finding of irreparable harm, but it does not foreclose such a finding. Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed.Cir.2008) (“A plaintiffs past willingness to license its patent is not sufficient per se to establish a lack of irreparable harm if a new infringer were added.”) (citing eBay, 547 U.S. at 393, 126 S.Ct. 1837). In the context of reputational injury, if patented features appear in products other than the infringer’s products, the marginal impact of the infringer’s use of those features may be minimized. The licensed use of patented features is sufficient to make those features appear commonplace, and thus the infringer’s use of those features has little or no impact. This reasoning does not apply here because there is no evidence that any of the licensees practiced any of the patented features. Samsung counters that it is Apple’s burden to produce evidence tending to prove the negative, i.e., to produce “evidence that Microsoft and HTC cannot and do not use the patented features.” Appellee Br. 38. Samsung’s argument misunderstands the burden applicable in this case. In requesting a permanent injunction, Apple of course bears the burden of production. Robert Bosch, 659 F.3d at 1154. Apple met this burden with the evidence cited above — particularly, the unique, direct, and fierce competition between the parties, Apple’s reputation as an innovator, and the importance of the patented features to that reputation. If Samsung seeks to rebut this evidence with instances of the use of the patented features by other parties, it was Samsung’s burden to show that this occurred. *1374 To hold otherwise would mean that proof of a lack of licensing activity is a prerequisite to injunctive relief, a position the Supreme Court rejected in eBay. 547 U.S. at 393, 126 S.Ct. 1837.[6]
Nor does the presence of the licensing agreements indicate that Apple considered monetary remedies sufficient to compensate it for Samsung’s infringement. As the district court found, the Nokia and HTC licenses are litigation settlements. 2014 WL 7496140 at *33. Though these agreements may allow for some form of monetary compensation, they have a fundamentally non-monetary undergirding— the end of a litigation between the parties. In addition, the licenses themselves indicate a strong desire on the part of Apple to carefully guard its own user experience. The HTC license excluded products that were “clones” of Apple’s products, and the license to Nokia only applied for a “standstill” period. Id. Most notably, the licensed companies are not Apple’s chief competitor. Thus, even if the licenses indicate a willingness to accept monetary compensation from Nokia and HTC, they would not show that monetary compensation is sufficient in this case. As we explained in Acumed, the “identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer” all affect whether monetary damages are sufficient to compensate for infringement. 551 F.3d at 1328.
Samsung also argues that a reliance on the factors described in Douglas Dynamics would create a “per se” rule of the sort that the Supreme Court rejected in eBay. Appellee Br. 30. Indeed, a theme that runs through both parties’ briefing is that the other side’s reasoning would impermis-sibly create a per se rule. Both sides are of course correct that eBay rejected this court’s “categorical grant” of injunctions absent exceptional circumstances. 547 U.S. at 394, 126 S.Ct. 1837. But relying on factors from past cases to determine whether a patentee will likely suffer irreparable harm is not the creation of a per se rule; it is the application of stare decisis. As Justice Holmes famously stated, “a page of history is worth a volume of logic.” N.Y. Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (quoted in eBay, 547 U.S. at 395, 126 S.Ct. 1837 (Roberts, C.J., concurring)).
III. Conclusion
I would hold that Samsung’s infringement amounted to an irreparable injury to Apple’s right to exclude. That injury is sufficient, based on the facts of this case, to grant an injunction. Apple also has shown that Samsung’s infringement will likely injure its reputation as an innovator in the fiercely competitive smartphone and tablet market.

. I refer to Samsung Electronics Company, Ltd.; Samsung Electronics America, Inc.; and Samsung Telecommunications America, LLC collectively as "Samsung.”

. See Apple Inc. v. Samsung Elecs. Co., 678 F.3d 1314 (Fed.Cir.2012) {“Apple I”); Apple Inc. v. Samsung Elecs. Co., 695 F.3d 1370 (Fed.Cir.2012) {"Apple II ’’); Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352 (Fed.Cir.2013) {“Apple III’’).

. Though Winter addressed the test in the context of a preliminary injunction, the substantive analysis for irreparable harm factor is the same for a permanent injunction. Amoco Prod. Co. v. Village of Gambell, AK, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

. As noted, an injunction is a form of forward-looking relief. Thus, arguments based on past harm implicitly assume that circumstances will not change.

. All license agreements are described in general terms because aspects of these agreements are confidential.

. The Dissent incorrectly asserts that requiring Samsung to provide evidence of instances of the use of the patented features by parties other than Samsung "arbitrarily shiftfs] the burden of proof to Samsung.” Dissent at 1375-76 n. 1. The burden of proof, of course, remains on Apple. But Apple does not have to prove a negative to carry that burden.